941 F.Supp. 101 (1996)
UNITED STATES FIDELITY & GUARANTY COMPANY, Plaintiff,
v.
FIRST STATE BANK AND TRUST COMPANY and Bank of Hayti, Inc., Defendant.
No. 1:93 cv 0184 SNL.
United States District Court, E.D. Missouri, Eastern Division.
October 7, 1996.
*102 W. Reeves, Ward and Reeves, Caruthersville, MO.
Daniel Wilke, Wilke and Wilke, St. Louis, MO.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
The Plaintiff has brought this declaratory judgment action, pursuant to 28 U.S.C. §§ 2201-2202, seeking a determination of its rights and obligations under an insurance policy issued in favor of the Defendant. The Plaintiff's case, including live testimony from three expert witnesses, was presented to the Court sitting without a jury on July 21, 1995. Due to scheduling problems, the Court agreed to hear the Defendant's case, consisting solely of expert testimony by one witness, at a later date. After additional scheduling problems arose, the Defendant, with leave of Court, submitted this testimony by deposition.
Before commencing with its factual and legal findings, there is a preliminary matter which the Court must first address. The Plaintiff has raised an objection concerning the qualifications of the Defendant's expert witness. The Plaintiff contends that the Defendant's expert is not qualified to offer an opinion regarding the events that occurred in this case because he has no advanced education or chemical training, and is inexperienced with matters outside of traditional fire investigations. The Court disagrees. This expert's years of experience in investigating fire scenes certainly qualifies him to offer an opinion in this case. Accordingly, this objection is overruled.
There were no other objections taken with the case, and all of the exhibits offered at trial are received into evidence.
*103 Therefore, having now considered the pleadings, the testimony of the expert witnesses, the depositions testimony, the documents in evidence and the stipulation of uncontested facts filed by the parties, and being fully advised in the premises, the Court hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
At the time of the events giving rise to this lawsuit, the nominal defendant, First State Bank and Trust Company and Bank of Hayti, Inc. ("FSB"), owned a metal building in Caruthersville, Missouri. FSB leased this building to a company by the name of Missouri Fabricated Products ("MFP" or "Defendant"). MFP is a subsidiary of Gleason Corporation. FSB has subsequently sold the building and assigned its rights under the insurance policy at issue to Gleason Corporation. Accordingly, Gleason Corporation is the real party in interest to this lawsuit.
Since there is no dispute concerning the business operations of MFP, the Court adopts the following statement of facts from the Plaintiff's Trial Brief:
[MFP] produces lawn and garden wheels. They take flat coil steel, stamp out the wheel halves, wash them and then put them into the welding process. They are then painted, seamed, mounted, tires are placed on them and they are shipped to the customers. After the wheels have been pressed out of the flat coil steel, they are put into the degreaser to remove the grease residue that is present on the steel. The degreaser itself is a vat that has heating coils in the bottom and contains liquid trichloroethane. When the machine is started up, the coils are activated and begin to heat up. The heat of the coils then causes the trichloroethane to boil, evaporate and create a vapor in the top portion of the vat. Around the top of the vat is a pipe containing cold water that causes the vaporized trichloroethane to condense and fall back to the bottom to be re-heated. The machine also includes a ventilator system to pull off any stray vapors that may escape. The wheel parts are placed in a basket and suspended in the vapor portion of the trichloroethane. There is a metal grate above the electrical coils in the bottom of the vat to prevent any objects that might fall out of the basket from falling and hitting the electrical coils. After the vaporized trichloroethane dissolves the grease, the grease falls to the bottom of the vat and is in solution with the liquid trichloroethane. Every four to six weeks, the machine must be cleaned and the trichloroethane containing the oil in suspension must be cleaned out of the machine.
At the end of the work day, the electrical coils are turned off first. After the trichloroethane has cooled down to a point where the vapor is no longer present, the operator turns off the water to the condensing ring. Then the ventilator fans are shut off. There is a roll top that goes over the top of the vat to keep objects from falling into the vat.
Pl's Trial Br. at 2-3.
On Saturday, August 14, 1993, the plant shut down around 12:30 p.m. Later that evening, one of MFP's employees, Adam Babcock, was fortuitously driving by the plant, and noticed that the lights were left on in the temporary office set up in a construction trailer out in front of the facility. Presumably to investigate, he walked into the plant and noticed that it was "smokey." Accordingly, he ran to the trailer, unlocked it and called the fire department.
The fire department arrived within minutes. The firemen went through the plant to make sure there were no open flames and told Babcock to open the windows and doors. Babcock also turned on the exhaust fans.
The firemen were able to locate the source of the smoke as the degreaser. Someone shut of the degreaser and the cloud dissipated.
The fire chief testified that he did not see any open flames, and that no water, hoses or any other type of fire fighting equipment was used during the incident. He also testified that the "smoke" was not very dense and had an unusual odor. Babcock's testimony was essentially the same.
*104 Although the parties differ on what caused this incident, both parties agree that the degreaser overheated and emitted a vapor cloud containing hydrochloric acid which damaged the inside of the plant.
The insurance policy at issue is a peril policy. As such, the policy only provides coverage for loss or damage to covered property if the loss or damage stems from a covered cause of loss. The relevant provisions of the policy provide:
A. COVERED CAUSES OF LOSS
When Basic is shown in the Declarations, Covered Causes of Loss means the following:
* * * * * *
1. Fire
* * * * * *
5. Smoke causing sudden and accidental loss or damage. This cause of loss does not include smoke from agricultural smudging or industrial operations.
At trial, the dispute mainly focused on whether or not the incident in question constituted a fire. The Plaintiff's experts all agreed that there was no fire. They testified that the incident in question was nothing more than an exothermic chemical reaction caused by the unstable condition of the degreaser. They surmised that in the process of shutting down the facility, the cold water pipe across the top of the degreaser was turned off, but that the heating element was inadvertently left on. As a result, the vaporized trichloroethane continued to rise and eventually escaped the confines of the vat. Upon reaching the atmosphere, the elements in the vapor combined with the hydrogen and oxygen molecules in the air to form hydrochloric acid.
The Plaintiff argues that this theory is corroborated by the testimony of the eye witnesses that there were no open flames and no fire fighting equipment was used during the incident.
The Plaintiff also argues that the vapor cloud emitted by the degreaser was the result of the Defendant's industrial operations. Consequently, the Plaintiff argues that even if the Court concludes that the damage was the result of smoke, this incident is still excluded under the terms of the policy.
The Defendant's expert testified that there was a fire. He opined that the heating element in the degreaser burned off so much of the trichloroethane that the heating coils became exposed. He further contended that because they were uncovered, the heating coils reached a level of such extreme heat that the oil deposits in the base of the degreaser combusted. He added, however, that the fire was not very big and had extinguished itself before anyone arrived on the scene.
The Defendant argues that the entire incident was precipitated by this fire in the vat of the degreaser.
Additionally, the Defendant argues that the resulting vapor cloud was not caused by its industrial operations. Accordingly, the Defendant argues that the exclusion is inapplicable and that the damage should be covered because "smoke" is a covered cause of loss.
After reviewing all of the evidence, including numerous photographs of both the degreaser and the plant, the Court concludes that there was no fire. The theory advanced by the Defendant's expert is simply belied by the evidence. Although the degreaser was rusted out in several places, there is nothing to indicate that a fire occurred. Most of the paint, circuits, and warning stickers on its exterior were in tact. In the places were the paint was damaged, there is no evidence of charring. On the contrary, the damage appears to be nothing other than rust. If, as the Defendant's expert testified, the degreaser had reached temperatures in excess of 1000 degrees Fahrenheit, the exterior of the degreaser would certainly have displayed this fact.
The plant itself is similarly devoid of evidence indicating that there was a fire. There were no smoke stains on the white lightweight plastic tarp which covered the ceiling directly above the degreaser. In fact, there were no smoke stains nor any evidence that a fire had occurred anywhere in the plant.
*105 Based upon this evidence, the Court cannot conclude that a fire occurred.
As a corollary to this finding, the Court additionally concludes that the emissions caused by this chemical reaction were gas vapors and not wood or oil burning smoke.

CONCLUSIONS OF LAW
Under Missouri law, words in insurance contracts are given their ordinary meaning. Arbeitman v. Monumental Life Ins. Co., 878 S.W.2d 915, 916 (Mo.App.1994). Exclusionary clauses are to be strictly construed against the insurer. Id. Any ambiguity in a policy is to be construed in favor of coverage and against the insurer. Peters v. Employers Mutual Casualty Co., 853 S.W.2d 300, 302 (Mo. banc 1993). If, however, a policy is unambiguous, it will be enforced as written. Id. In any case, the court must view the language in light of the meaning that would ordinarily be understood by the lay person who bought and paid for the policy. Robin v. Blue Cross Hospital Service, Inc., 637 S.W.2d 695, 698 (Mo. banc 1982).
In light of the Court's conclusion that there was not a fire, the only issues left for determination are whether a cloud of gas vapors can be considered "smoke" under the policy, and if so, whether this incident falls within the exclusion for "smoke from industrial operations."
The Court has not found any Missouri cases defining the parameters of the term "smoke," as used in insurance policies. Other jurisdictions that have considered the matter have gone both ways. See K & Lee Corp. v. Scottsdale Ins. Co., 769 F.Supp. 870, 873 (E.D.Pa.1991), aff'd, 953 F.2d 1380 (3rd Cir. 1992) (vapor not considered smoke); Capital Bank & Trust Co. v. Equitable Life Assur. Soc. of U.S., 542 So.2d 494, 496 (La.1989) (same); compare Henri's Food Products Co. v. Home Ins. Co., 474 F.Supp. 889, 892-93 (E.D.Wis.1979) (vapor considered smoke); Farmers Ins. Co. v. Trutanich, 123 Or.App. 6, 858 P.2d 1332, 1336 (1993).
However, taking a common sense approach, this Court concludes that most lay persons would distinguish smoke from gas vapors. For instance, most people would not consider vapors emanating from the sewers on a cold day to be smoke. Similarly, steam coming off a body of water or a hot cup of coffee is generally not considered smoke. Although fog certainly has a "smokey" appearance, most people do not refer to it as smoke. Therefore, the Court concludes that, under a lay persons definition, the word smoke is unambiguous and does not include gas vapors.
Furthermore, the test set out in Robin, supra, is how the words would be understood by the lay person who bought and paid for the policy. In this case, the Defendant bought a peril policy. Unlike a more comprehensive all-risk policy, this policy specifically delineates the causes of loss for which coverage is provided. Although it certainly could have, the policy does not list gas vapors as a covered cause of loss. Moreover, it would be unreasonable to find such coverage in the terms "fire" and "smoke," as defined by the policy. Therefore, the Court concludes that a lay person, reading this policy as a whole, would not assume that coverage was intended for damage caused by a cloud of hydrochloric acid emanating from a piece of industrial machinery. Accordingly, because the Court finds that the damage from this incident did not arise from a covered cause of loss, judgment is entered in favor of the Plaintiff.