# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 96-3893

———————

United States Fidelity and      *
Guaranty Company,      *
     *
            Appellee,      *
     *   Appeal from the United States
    v.      *   District Court for the
     *   Eastern District of Missouri
First State Bank and Trust Company;   *
Bank of Hayti,      *
     *
           Appellants.      *

———————

Submitted: April 10, 1997

Filed: October 2, 1997

———————

Before McMILLIAN, FLOYD R. GIBSON, and JOHN R. GIBSON,
    Circuit Judges.

———————

McMILLIAN, Circuit Judge.


    Appellants First State Bank and Trust Company and Bank of Hayti, Inc., appeal from a final order entered in the United States District Court[1] for the Eastern District of Missouri declaring that damage resulting from an incident at an industrial plant did

———————

[1]The Honorable Stephen N. Limbaugh, Senior United States District Judge for the Eastern District of Missouri.

not arise from a cause of loss covered under an insurance policy issued by United States Fidelity and Guaranty Company (USFG). <u>United States Fidelity & Guar. Co. v. First State Bank & Trust Co.</u>, 941 F. Supp. 101 (E.D. Mo. 1996) (<u>United States Fidelity & Guar. Co.</u>). For reversal, appellants argue that the district court erred in holding that (1) no fire occurred during the incident and (2) "smoke" has a different meaning from "vapor." For the reasons discussed below, we affirm the order of the district court.

Jurisdiction was proper in the district court based upon 28 U.S.C. §§ 1332 and 2201-2202. Jurisdiction on appeal is proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed under Fed. R. App. P. 4(a).

## I. Background

The following facts are taken primarily from the district court order. <u>United States Fidelity & Guar. Co.</u>, 941 F. Supp. at 103-05. At the time of the events giving rise to this lawsuit, appellants owned a metal building in Caruthersville, Missouri. Appellants leased the building to Missouri Fabricated Products (MFP), a subsidiary of Gleason Corporation (Gleason). Appellants subsequently sold the building and assigned their rights under the insurance policy at issue to Gleason, which is the real party in interest to this lawsuit.

MFP uses the building as an industrial plant for the production of metal lawn and garden wheels. The production process involves stamping the wheel parts out of flat coil steel, washing the parts, welding them together, painting the metal parts, and mounting tires on the wheels. After the process is complete, MFP ships the assembled wheels to its customers.

In the early stages of the production process, the coil steel is protected by a heavy grease that must be removed before the wheel parts are painted and assembled.

-2-

The grease is removed in a machine called a "Detrex Degreaser," consisting of a large, square vat which is partially filled with liquid trichloroethane (TCE) and has electrical coils in the bottom. When the machine is started, the electrical coils are activated and begin to warm. The heat from the electrical coils causes the TCE to boil, evaporate, and create a vapor in the top portion of the vat. Around the top of the vat is a pipe containing cold water that causes the vaporized TCE to condense and fall back to the bottom of the vat to be re-heated by the coils. The machine is equipped with a ventilator system to pull off any stray vapors that escape from the vat. The wheel parts are placed in a basket and suspended in the vaporized TCE. A metal grate above the electrical coils in the bottom of the vat prevents any objects that might fall from the basket from landing on the electrical coils. The vaporized TCE dissolves the grease, and the grease falls to the bottom of the vat and is suspended in the liquid TCE. Every four to six weeks, the machine must be cleaned and the TCE containing the suspended oil must be cleaned out of the machine.

At the end of a work day, the electrical coils are turned off first. After the TCE has cooled to a point where the vapor is no longer present, the operator turns off the water to the condensing ring. Then the ventilator fans are shut off. A roll top covers the vat to keep objects from falling into it.

On Saturday, August 14, 1993, the plant closed around 12:30 p.m. Later that evening, MFP employee Adam Babcock drove by the plant and noticed that the lights were left on in the temporary office set up in a construction trailer in front of the building. Babcock went into the plant, noticed that it was "smoky," and ran to the trailer to call the fire department.

Within minutes, the fire fighters searched the plant to be sure there were no open flames and instructed Babcock to open the windows and doors. Babcock also activated the exhaust fans. The fire fighters determined that the degreaser was the source of the "smoke," and, after it was shut off, the "smoke" dissipated. The fire chief testified that

he did not see any open flames and that no water, hoses, or any other type of fire fighting equipment was used during the incident. He also testified that the "smoke" was not very dense and had an unusual odor. Babcock's testimony was similar. Although the parties disagree on what caused the incident, they agree that the degreaser overheated and emitted a vapor cloud containing hydrochloric acid which damaged the inside of the plant. They also disagree on whether the damage is a covered loss under the insurance policy issued by USFG.

USFG brought this declaratory judgment action, seeking a determination of its rights and obligations under the insurance policy issued by USFG to appellants covering the building used by MFP. On July 21, 1995, USFG presented its case, including live testimony from three expert witnesses, to the district court sitting without a jury. Due to scheduling problems, the district court agreed to hear appellants' case, consisting solely of testimony from one expert witness, at a later date. After additional scheduling problems, appellants, with leave of court, submitted the testimony by deposition.

The insurance policy at issue is a peril policy providing coverage for loss or damage to covered property if the loss or damage stems from a covered cause of loss. The relevant policy provisions provide:

**A. COVERED CAUSES OF LOSS**

When Basic is shown in the Declarations, Covered Causes of Loss means the following:

. . . .

**1. Fire**

. . . .

> **5.** **Smoke** causing sudden and accidental loss or damage.  This cause of loss does not include smoke from agricultural smudging or industrial operations.

At trial, the dispute focused mainly on whether or not the incident in question constituted a fire.  USFG's experts agreed that there had been no fire.  They testified that the incident in question was nothing more than an exothermic chemical reaction caused by the unstable condition of the degreaser.  They concluded  that, in closing the facility, the cold water pipe above the degreaser had been turned off, but the heating element in the vat had inadvertently been left on and, as a result, the vaporized TCE continued to rise, escaped the vat, reached the atmosphere, and combined with hydrogen and oxygen in the air to form hydrochloric acid.

By contrast, appellants' expert testified that there had been a fire. He opined that the degreaser's heating element burned off so much of the TCE that the heating coils became exposed and reached a level of such extreme heat that the oil deposits in the base of the vat combusted.  He suggested that the fire was not very big and had extinguished itself before anyone arrived on the scene.

USFG also presented evidence that, whether or not the damage was caused by smoke, the incident is still excluded under the policy because it resulted from industrial operations.  However, appellants presented evidence that the damage should be covered under the policy because it was caused by smoke -- the vapor cloud -- that was not a result of industrial operations.

After reviewing all of the evidence, the district court concluded that, as a matter of fact, there had been no fire in the building during the incident and, as a corollary, that the emissions caused by the chemical reaction were gas vapors and not wood-burning or oil-burning smoke. United States Fidelity & Guar. Co., 941 F. Supp. at 105. The district court further concluded that, as a matter of law, "gas vapors" does not mean "smoke" to the ordinary lay person. Id. The district court thus held that the relevant policy language regarding damage from "fire" and "smoke" does not cover the damages to the building resulting from the August 14, 1993, incident. Id. This appeal followed.

## II. Discussion

A. "Fire"

Appellants argue that the district court's finding that there was no fire involved in the August 14, 1993, incident must be reversed as clear error because it is against the weight of credible evidence, not supported by substantial evidence, and contrary to law. Appellants contend that the most coherent and logical account of the events was provided by appellants' expert, Robert Lowe. Appellants claim that the district court clearly erred in rejecting Lowe's theory that there was a fire because his was the only version of the incident which took into account the undisputed presence of certain combustible materials in and on the degreaser vat.

Appellants also argue that the district court's finding was contrary to law because, under Missouri law, the words in an insurance policy must be given their

ordinary meaning.  Appellants claim that the ordinary meaning of "fire" is "[a] rapid, persistent chemical reaction that releases heat and light, esp. the exothermic combination of a combustible substance with oxygen."  Brief for Appellants at 19, quoting Webster's II New Riverside University Dictionary 480 (1984) (Webster's II).  Appellants contend that a flame is not required to satisfy the ordinary meaning of the word "fire."  Rather, contend appellants, the incident satisfies the ordinary meaning of "fire" because a "rapid, persistent chemical reaction," which was in fact an "exothermic" reaction, occurred.  Appellants maintain that the presence of certain elements -- i.e., light from the glow of the electrical coils; combustible materials, including cutting oil residue and paint; and oxygen, or at least an oxidizer -- combined to create a "fire."

We disagree and hold that the district court did not err in concluding that what occurred in this case does not come within the ordinary meaning of "fire" as defined by the district court or by appellants.  Appellants failed to present evidence that a flame had been present. United States Fidelity & Guar. Co., 941 F. Supp. at 104.  There was also no evidence of charring or smoke stains above the degreaser or anywhere in the plant, and, in fact, the only damage appeared to be rust. Id.  Based on the evidence presented at trial, the district court's finding that there was no fire is not clearly erroneous.

Applying, without adopting, appellants' definition of "fire," we reject appellants' contention that the "glow" of the electrical coils falls within the definition of fire.  In any event, although an "exothermic" reaction apparently occurred, USFG's experts' testimony that no oxygen could have entered the vat during the incident was sufficient

to support the district court's conclusion that the reaction did not involve oxygen, as is required under appellants' proffered definition of fire.

B. "<u>Smoke</u>"

Appellants argue that the term "smoke" is not defined in the insurance policy and should thus be interpreted, under its ordinary meaning, to include the gaseous by-product of the exothermic chemical reaction described by the expert witnesses. Appellants define "smoke" as:

> 1. Vapor made up of small particles of carbonaceous matter in the air, resulting chiefly from incomplete combustion of organic material, such as wood or coal. 2. A suspension of particles in a gaseous medium. 3. A cloud of fine particles.

Brief for Appellants at 21, <u>quoting</u> <u>Webster's II</u> at 1098. Appellants define "vapor" as "[b]arely visible or cloudy diffused matter, as mist, fumes, or smoke, suspended in the air." <u>Id.</u> at 22, <u>quoting</u> <u>Webster's II</u> at 1276. Appellants maintain that the policy covers the incident because the active agent, which was released from the degreaser and damaged the metal surfaces of the facility's interior, "was a chemical substance produced by a rapid, exothermic reaction, and was suspended as fine particles in a gas or vapor," <u>id.</u> at 23, and thus falls within the ordinary meaning of "smoke." Appellants contend that to narrowly interpret "smoke" as the by-product of burning wood or oil ignores the technology of today's industrial world. Appellants argue that the district court erred in excluding gaseous vapors from its interpretation of "smoke" and, therefore, this case should be remanded to the district court to determine whether the vapor or smoke resulted from industrial operations.

We disagree with appellants' definition of the term "smoke" because a term's ordinary meaning is derived from the interpretation of lay persons rather than the definition provided in a dictionary. See Robin v. Blue Cross Hosp. Serv., Inc., 637 S.W.2d 695, 698 (Mo. banc 1982); see also Cantrel v. Farm Bureau Town & Country Ins., 876 S.W.2d 660, 664-65 (Mo. Ct. App. 1994) (per curiam) (rejecting dictionary definition of "contamination" in favor of a reasonable person's interpretation). Missouri cases have not defined "smoke" as used in insurance policies, and other jurisdictions which have addressed the issue have developed varying interpretations. See, e.g., K & Lee Corp. v. Scottsdale Ins. Co., 769 F. Supp. 870, 874 (E.D. Pa. 1991) (holding that invisible chemical vapor is not ordinarily and commonly understood to be "smoke"), aff'd, 953 F.2d 1380 (3d Cir. 1992) (table); Henri Food Prods. Co. v. Home Ins. Co., 474 F. Supp. 889, 893 (E.D. Wis. 1979) (holding that a vapor which left a residue on plaintiff's goods was smoke); Capital Bank & Trust Co. v. Equitable Life Assurance Soc'y of the United States, 542 So. 2d 494, 496 (La. 1989) (holding that a person of average understanding would not regard "smoke" as a gas or vapor); State v. Mundet Cork Corp., 86 A.2d 1, 4 (N.J.) (defining smoke to include "visible products of combustion in the normally accepted sense"), cert. denied, 344 U.S. 819 (1952); Aubertel v. Consolidated Edison Co., 116 N.Y.S.2d 555, 558 (Mun. Ct. 1952) (generally defining "smoke" as a visible exhalation from burning material); cf. Farmers Ins. Co. v. Trutanich, 858 P.2d 1332, 1336 (Or. Ct. App. 1993) (declining to decided whether, as a matter of law, smoke includes vapor). We need not develop a definition under Missouri law because, under appellants' proffered definition of "smoke," the vapor involved, hydrogen chloride, did not contain any particulate matter and, therefore, does not constitute "smoke." The vapor produced by the boiling liquid TCE is analogous to steam produced by boiling water, which most people would not consider "smoke" despite its smoky appearance.

Furthermore, even if we were to hold that the chemical vapor was "smoke" within the meaning of the policy, it was the result of the degreaser's malfunctioning.

Because the operation of the degreaser is an "industrial operation," this incident is specifically excluded from coverage under the terms of the peril policy.

### III. Conclusion

Based upon the testimony presented at trial, the district court's finding that a fire did not occur is not clearly erroneous. As a matter of law, the district court did not err in distinguishing "vapor" from "smoke." In any event, the vapor or smoke resulted from an industrial operation and therefore does not qualify as a covered cause of loss under the policy. Accordingly, the order of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-10-