FARMLAND INDUSTRIES,
INC., Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, et al., Defendants.

No. 02–4135–JAR.

United States District Court,
D. Kansas.

Aug. 27, 2004.

**1134**

Lee M. Smithyman, Overland Park, KS, for Plaintiff.

Christopher F. Burger, Peter K. Curran, Lawrence, KS, Ethan V. Torrey and Matthew M. Burke, Ropes & Gray, Boston, MA, for Defendants.

### MEMORANDUM ORDER DENYING MOTION FOR SUMMARY JUDGMENT & DENYING CROSS–MOTION FOR SUMMARY JUDGMENT

ROBINSON, District Judge.

This diversity action involves coverage under an all-risk insurance policy in a dispute between the insured plaintiff, Farmland Industries, Inc. ("Farmland") and the insurer defendants National Union Fire Insurance Company of Pittsburgh, Pennsylvania; Qatar General Insurance and Reinsurance Company; Certain Underwriters at Lloyd's of London; Gerling Konzern Allgemeine Versicherungs–AG; and Allianz Insurance Company (the "Insurers"). This matter comes before the Court on Farmland's Motion for Summary Judgment (Doc. 29) and the Insurers' Cross–Motion for Summary Judgment (Doc. 33). For the reasons stated below, Farmland's motion is denied and the Insurers' cross-motion is denied.

### I. Uncontroverted Facts [1]

On October 1, 1998, Farmland entered into a natural gas storage agreement with Manchester Gas Storage, Inc., ("Manchester") that entitled Farmland to purchase, receive and store natural gas at the Manchester Storage Facility ("Facility") in Grant County, Oklahoma. The Facility is a depleted natural gas reservoir consisting of "working gas" and "cushion gas." Working gas is the amount of gas in a storage reservoir that may be withdrawn. Cushion gas is gas that must remain in the reservoir to provide the pressure necessary to allow the withdrawal of working gas. Manchester's owner, William Davis, also owned Mountain Energy Corporation ("MEC"). In 1999, Mr. Davis sold MEC to Michael Eichenberg and Roderick Donovan. On February 1, 1999, Manchester appointed MEC as its marketing and managing agent for the Facility.

On April 1, 1999, MEC entered into a Gas Sales and Purchase Contract with Anadarko Energy Services Company ("Anadarko"), a large natural gas supplier. Pursuant to the contract, Anadarko would provide natural gas to MEC for storage and resale. Anadarko also entered into a Firm Storage Service Agreement with Manchester for utilization of the Facility.

On April 5, 2000, Craig Smyth of Farmland and Mr. Eichenberg reached an oral agreement in which "Farmland buys .5 bcf

---

**1.** The Court has excluded all irrelevant facts and "facts" which are in essence merely legal conclusions. In particular, the Court has excluded the Insurers' numerous references to the gas contained in account 4622, which are irrelevant and serve only to confuse matters, as even the Insurers recognize that the natural gas at issue in this case was not contained in that account.

[or 500,000 MMBtu] physical gas from [MEC], transferred in place to 2nd Farmland account with Manchester." The agreement further provided that "Farmland agrees to take the gas out in October—either by withdrawal or in-place transfer to Farmland's regular storage account, or settle financially." Farmland had no right to receive, withdraw, or use the natural gas until October 2000. At the same time as Farmland's sale, MEC also entered into a virtually identical transaction with Tenaska Marketing Ventures (Tenaska).

Prior to Farmland's purchase, MEC bought 1.5 BCF of natural gas from Terra Nitrogen Corporation ("Terra"). The Terra natural gas was physically present in the Facility. Mr. Donovan testified that the 500,000 MMBtu sale of natural gas to Farmland "was natural gas that related directly to the purchase of the remaining storage balance of Terra." Both Mr. Donovan and Mr. Eichenberg testified that the 500,000 MMBtu of natural gas sold to Farmland was physically present in the Facility at the time of the sale. Additionally, Farmland employee Richard Schuck testified that based upon his review of storage records and the testimony of Mr. Donovan and Mr. Eichenberg, he concluded that the natural gas was physically present in the Facility in April 2000.

From February 2000 through June 2000, MEC prepared a monthly storage inventory for the Facility reflecting the amount of cushion gas and working gas, by account, in the Facility. From July 2000 through October 2000, similar storage inventory records were prepared by Manchester. The storage inventory records were one way to track the amount and ownership of gas in the Facility. Manchester also periodically confirmed the total amount of gas in the Facility through a physical estimate of the gas using reservoir size and current

average reservoir pressures, which was performed by Lee Keeling and Associates.

MEC and later Manchester generated monthly statements reflecting the beginning and ending inventory and any activity during the month for each customer. Farmland received these monthly statements, which showed that 500,000 MMBtu of natural gas was physically present in the facility from April 2000 through August 2000. Farmland relied on the monthly statements, among other documents, to account for the existence and amount of natural gas held at the Facility. Manchester did not receive a statement showing Farmland's purchase of 500,000 MMBtu of natural gas; instead the statement listed only Terra's account.

Sometime in April of 2000, MEC committed to the withdrawal of 635,000 MMBtu of the Terra gas on a ratable basis over the month of April for sale to its customers in the Kansas City area. Manchester's intention was to sell the remaining approximately 800,000 MMBtu of Terra gas into the market during the summer of 2000. On April 17, 2000, however, Manchester sent MEC a letter accusing MEC of violating its contractual obligations as agent of the Facility and prohibited MEC from releasing any portion of the Terra gas. MEC subsequently sold the remainder of the Terra gas to Anadarko.

In July 2000, Manchester terminated MEC as agent of the Facility and commenced managing the Facility itself. On July 15, 2000, MEC sent Manchester a fax concerning financial disagreements, which stated "you asked me not to-call on Farmland because if they choose to withdraw gas the facility will not physically be able to perform for Anadarko and Farmland both." Farmland was unaware of the dispute or the communication between Manchester and MEC.

In September, MEC had difficulties in delivering gas to all of its customers. On September 27, 2000, Mr. Schuck had a conversation with Mr. Donovan, in which Mr. Schuck asked MEC to deliver Farmland's natural gas in October or to transfer it into another storage account with Manchester. Mr. Donovan indicated that he could not make delivery of the gas and could not transfer it to Farmland's other storage account. This conversation made Mr. Schuck believe "at that time that the gas was not there. Otherwise, he would have been able to do one or the other." Sometimes in early October after Farmland was unable to receive delivery of its gas, Mr. Schuck reviewed Manchester's inventory records. Mr. Schuck's record review led him to conclude that Manchester, MEC or Anadarko took Farmland's 500,000 MMBtu of natural gas. Around this same time, Tenaska conducted an audit which similarly revealed a shortage of gas at the Facility. By October 2000, MEC had outstanding deals with various parties totaling at least 5 BCF, but the total natural gas in the Facility was 7.01BCF, and of that amount 6.139 BCF was cushion gas and .871 BCF was working gas.

On October 25, 2000, Manchester issued a press release concerning its problems with MEC which stated that "Manchester has allowed all of [MEC's] customers to conduct independent audits of the storage records to establish that the 'alleged' purchased gas was never located in the Manchester storage facility." MEC and Manchester subsequently went into bankruptcy. Manchester contended in court filings connected to its bankruptcy that although MEC represented to certain customers that it had purchased natural gas for future delivery that was currently stored in the Facility, the gas was not actually purchased by MEC.

MEC never paid Farmland for the 500,-000 MMBtu of natural gas Farmland purchased in April 2000. Farmland has not recovered any of the natural gas. Farmland did, however, recover $700,000 from this transaction.

Farmland is covered by an all-risk policy (Policy) for which the Insurers have underwritten various percentages of liability. The policy period is November 1, 1997 to November 1, 2000. The annual premium for the Policy was $3,705,000.00. The policy insures: "ALL RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, to the property of the Insured as described herein, and for the coverages designated in the policy territory." The definition of property provided by the Policy is:

> All Real and Personal Property of any kind and description, now owned by the Insured or hereafter acquired or in which the Insured has or may acquire an interest including property in the course of construction or installation, including contractors interest, property of others for which the Insured may have assumed liability or property in the Insured's care, custody, and control for which the Insured may be legally liable, all while situated in or while in transit within the territorial limits of this policy.

The territorial limits of the Policy are the United States, Mexico and Canada.

A policy exclusion addresses natural gas. Specifically excluded from the Policy is: "Subterranean strata except coverage is provided for crude petroleum and its products including but not limited to natural gas and other minerals while stored in strata of any nature after initial recovery above ground unless otherwise provided for under this policy . . . ."

The Policy also excludes:

> Unexplained or mysterious disappearance of any property, or shortage re-

vealed only by audit or upon taking inventory; or any fraudulent, dishonest or other act intended to result in the financial gain of the Insured or any associate, proprietor, partner, director, trustee, elected officer, employee or agent of the Insured ....

Farmland has filed a notice of claim and made demands for payment for the loss of natural gas under the Policy, but the Insurers have refused Farmland's demand.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[2] The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[3] Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case.[5] Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.[6] "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial."[7] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.[8] The Court must consider the record in the light most favorable to the nonmoving party.[9]

The Court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[10]

## III. Discussion

Farmland's claim is made on an "all-risk" policy. The Policy provides first-party property insurance and covers "ALL RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, to the property of the insured." The insured's property is "all real and personal property of every kind and description, now owned by the Insured or hereafter acquired or in which the Insured has or may acquire an interest ... while situated in or while in transit within the

---

**2.** Fed.R.Civ.P. 56(c).

**3.** See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**4.** Id. at 251–52, 106 S.Ct. 2505.

**5.** See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**6.** See Anderson, 477 U.S. at 256, 106 S.Ct. 2505.

**7.** Id.

**8.** See id.

**9.** See Bee v. Greaves, 744 F.2d 1387, 1396 (10th Cir.1984), cert. denied 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

**10.** Celotex, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

territorial limits of this policy." The policy also contains a provision specific to natural gas which states, "coverage is provided . . . to natural gas and other minerals while stored in strata of any nature."

In spite of Policy language suggesting that natural gas is insurable, the Insurers argue that the lost gas is not insured property because: (1) the gas was not in existence so there could be no physical loss; and (2) if the gas was insured property, it is excluded because it was "revealed only by audit or upon taking inventory;" and it is an "unexplained or mysterious disappearance" of property.

An all-risk insurance policy creates a special type of insurance extending to risks not usually contemplated.[11] All-risk policies, however, are not "all loss" policies.[12] Instead, all-risk policies contain express written exclusions and implied exceptions which have been developed by courts over the years.[13] Thus, recovery under an all-risk policy will generally be allowed, at least for all losses of a fortuitous nature, in the absence of fraud, or other intentional misconduct of the insured, unless the policy contains a specific provision expressly excluding the loss from coverage."[14]

State law governs the interpretation of insurance contracts, and in this case, Missouri law controls.[15] "[I]n Missouri, the insured has the burden of proving that the loss and damages claimed are covered by the insuring provisions, and the insurer has the burden of proving the applicability of any exclusion upon which it relies."[16] Disputes arising from interpretation and application of insurance contracts are matters of law for the court where there are no underlying facts in dispute.[17] Thus, Farmland bears the initial burden of demonstrating that there is no genuine issue of material fact that it has suffered a physical loss or damage to insured property.

## A. Insured Property

The Insurers argue that Farmland cannot meet its burden of proof of showing that the natural gas is covered property because Farmland cannot demonstrate that it actually owned the natural gas, as compared with merely holding a contractual right to the delivery of gas at a later

---

**11.** *Texas E. Transmission Corp. v. Marine Office–Appleton & Cox Corp.,* 579 F.2d 561, 564 (10th Cir.1978).

**12.** *Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.,* 245 F.Supp.2d 563, 579 (D.N.J.2001); *Intermetal Mexicana S.A. v. Ins. Co. of N. Am.,* 866 F.2d 71, 75 (3d Cir. 1989).

**13.** *GTE Corp. v. Allendale Mut. Ins. Co.,* 258 F.Supp.2d 364, 373 (D.N.J.2003).

**14.** *Texas E. Transmission Corp.,* 579 F.2d at 564; *Pakmark Corp. v. Liberty Mut. Ins. Co.,* 943 S.W.2d 256, 259 (Mo.Ct.App.1997).

**15.** Kansas choice of law rules apply in this diversity action. *United States Fid. & Guar. Co. v. Federated Rural Elec. Ins. Co.,* 286 F.3d 1216, 1218 (10th Cir.2002). Under those rules, the law of the state where the contract

was entered into controls. *Aselco, Inc. v. Hartford Ins. Group,* 28 Kan.App.2d 839, 21 P.3d 1011, 1020 (2001). "In interpreting an insurance contract where there is a conflict of laws, Kansas follows the ex loci rule, and the law of the state where the contract is made governs." *Id.* In cases involving insurance policies, the contract is made where the policy is delivered. *Layne Christensen Co. v. Zurich Canada,* 30 Kan.App.2d 128, 38 P.3d 757, 767 (2002). The Policy was delivered to Farmland in Missouri, and therefore, the contract was made in Missouri. Missouri law thus controls this dispute.

**16.** *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Structural Sys. Tech., Inc.,* 964 F.2d 759, 761 (8th Cir.1992) (applying Missouri law).

**17.** *Watters v. Travel Guard Int'l,* 136 S.W.3d 100, 107 (Mo.Ct.App.2004).

date. It follows, the Insurers contend, that if Farmland did not actually own the gas, it never suffered a "direct physical loss" as required to recover under the Policy.

To determine whether Farmland received a bare contract right, or physical natural gas from MEC in the April 2000 transaction, the Court must scrutinize the oral agreement between the parties to discover the parties' intent.[18] On April 5, 2000, Farmland and MEC reached an oral agreement in which "Farmland buys .5 bcf [or 500,000 MMBtu] physical gas from [MEC], transferred in place to 2nd Farmland account with Manchester." The agreement further provided that "Farmland agrees to take the gas out in October—either by withdrawal or in-place transfer to Farmland's regular storage account, or settle financially." During the conversation which culminated in the oral contract, the parties mention "physical volumes," "in place," "in the ground at Manchester." In addition, the storage deal related to the April 5 purchase lists the purchase cost of "gas in-place at Manchester" and provides "Farmland buys .5bcf physical gas from [MEC]." Thus, the contracting parties' intent demonstrates that Farmland purchased 500,000 MMBtu of existing, physical natural gas from MEC, not a bare contract right to later delivery.

Disputed facts remain regarding whether the natural gas was physically present in the Facility in April 2000. MEC purchased 1.5 bcf of natural gas from Terra in March or early April of 2004 and this gas was physically present in the Facility. Mr. Donovan testified that the 500,000 MMBtu sale of natural gas to Farmland "was natural gas that related directly to the purchase of the remaining storage balance of Terra." Both Mr. Donovan and Mr. Eichenberg testified that the 500,000 MMBtu of natural gas sold to Farmland was physically present in the Facility at the time of the sale. Additionally, Mr. Schuck testified that based upon his review of storage records and the testimony of Mr. Donovan and Mr. Eichenberg, he concluded that the natural gas was physically present in the Facility in April of 2000. Monthly storage summaries provided by MEC to Farmland showed that the gas was physically present in the Facility from April 2000 through August 2000.

The Insurers suggest, on the other hand, that Farmland's gas was not physically present at the Facility. The Insurers note that MEC sold approximately 635,000 MMBtu of the Terra gas to customers in the Kansas City area in April of 2000. Additionally, at the same time as the Farmland sale, MEC sold 500,000 MMBtu of the Terra gas to Tenaska. If the Kansas City and the Tenaska sale occurred before Farmland's purchase, there would only be approximately 365,000 MMBtu of Terra gas still physically present in the Facility, short of the 500,000 MMBtu necessary to cover Farmland's purchase.[19] Moreover, Manchester concluded that although MEC represented to certain customers that it had purchased natural gas for future delivery that was being stored in the Facility, the gas was not actually purchased by MEC. The monthly inventory statements provided by MEC to Manches-

---

18. *See CB Commercial Real Estate Group, Inc. v. Equity P'ships Corp.*, 917 S.W.2d 641, 646 (Mo.Ct.App.1996) ("The primary rule of contract interpretation is to ascertain the intent of the parties and to give effect to that intent").

19. The Insurers also note that MEC intended to sell approximately 800,000 MMBtu of the Terra gas into the market in the Summer of 2000, but this fact is irrelevant; MEC's ill intentions in the Summer of 2000 are not important, rather the amount of physical gas acquired by Farmland on April 5, 2000 is the key inquiry.

ter did not show Farmland's 500,000 MMBtu purchase, but instead only listed Terra's account. Consequently, the Court concludes that genuine issues of material fact remain regarding whether the natural gas was physically present in the Facility at the time of Farmland's purchase on April 5, 2000.[20]

## B. Policy Exclusions

■ The Insurers argue that even if whether the natural gas was covered property is a disputed fact, summary judgment is still appropriate because two Policy exclusions bar Farmland's recovery. First, they contend that the gas shortage was "revealed only by audit or upon taking inventory;" and is thus excluded. Additionally, the Insurers claim that the gas is excluded as it is an "unexplained or mysterious disappearance" of property. The Insurers bear the burden of proving that the lost natural gas is an excluded peril.[21] Under Missouri law exclusionary clauses are to be strictly construed against the insurer, but if the contract language is clear and unambiguous, the Court must construe the policy as written for it lacks the power to rewrite the policy.[22] Insurance contracts are designed to furnish protection, and therefore, they will be interpreted to grant coverage rather than defeat it.[23]

### 1. Shortage Revealed Only By Audit or Upon Taking Inventory

■ The Policy excludes from coverage a "shortage revealed only by audit or upon taking inventory." When interpreting the language of an insurance contract, Missouri courts give the language its plain meaning.[24] "The plain or ordinary meaning is the meaning that the average layperson would understand" as found in standard English language dictionaries.[25] Thus, audit means "[a]n examination of records or financial accounts to check their accuracy" and inventory means "[a] detailed itemized record of things in one's view or possession, esp. a periodic survey of all goods and materials in stock." [26]

There is no question that there was a shortage of natural gas at the Facility in October 2000. By October 2000, MEC had outstanding deals with various customers totaling at least 5 BCF. The natural gas balance at the Facility, however, was only 7.01 BCF, with 6.139 BCF consisting of cushion gas and only .071 BCF in working gas. There is similarly no question that the "shortage revealed only by audit or upon taking inventory exception" applies to fungible goods, such as natural gas.[27]

The focus then becomes whether the gas shortage was revealed only upon audit or inventory. The Insurers argue that the storage inventory records were the only

---

**20.** Because disputed issues of material fact remain regarding whether the natural gas was covered property, the Court need not reach the issue of physical loss.

**21.** *See Russell v. Reliance Ins. Co.,* 645 S.W.2d 166, 170 (Mo.Ct.App.1982).

**22.** *United States Fid. & Guar. Co., v. First State Bank & Trust Co.,* 941 F.Supp. 101, 105 (E.D.Mo.1996) (applying Missouri law).

**23.** *Centermark Properties, Inc. v. Home Indem. Co.,* 897 S.W.2d 98, 100–101 (Mo.Ct.App. 1995).

**24.** *Shahan v. Shahan,* 988 S.W.2d 529, 535 (Mo.1999) (en banc).

**25.** *Id.*

**26.** Am. Heritage College Dictionary 90, 714 (3d ed.2000).

**27.** *See, e.g., Jones v. Employers Mut. Cas. Co.,* 230 Neb. 549, 432 N.W.2d 535 (1988) (shortage of gasoline stored in underground tank); *Empire Underground Storage, Inc. v. Protective Nat'l Ins. Co. of Omaha,* 685 F.Supp. 1187, 1191 (D.Kan.1988).

manner in which the amount and ownership of gas in the Facility could be tracked, and thus, the only possible means of uncovering a shortage. It is undisputed that the storage inventory records were one way to track the amount and ownership of gas at the Facility, and that Farmland relied in part upon the inventory records to account for the existence and amount of gas held at the Facility. It is also undisputed that on approximately October 11, 2000, Mr. Schuck traveled to Farmland's office and made copies of documents provided by Manchester and that sometime after receiving those documents, Mr. Schuck reviewed the records. From his review of the documents, Mr. Schuck concluded:

> I could tell at one point in time Terra had approximately 1.5 BCF of gas in their storage field. I could tell that part of that gas was withdrawn and part of it was transferred over to a contract held by Anadarko .... I could also tell the gas was subsequently withdrawn off the Anadarko contract. I could not get a level of detail that would allow me to specifically track our half of BCF."

In response, Farmland notes that the shortage was revealed not only through inventory records, but through other means, including the September 27, 2000, conversation in which Farmland asked MEC to deliver the natural gas in October or to transfer it into another storage account with Manchester. Mr. Donovan indicated that he could not make delivery of the gas and could not transfer it to Farmland's other storage account. This conversation made Mr. Schuck believe "at that time that the gas was not there. Otherwise, he would have been able to do one or the other." Farmland additionally points to Lee Keeling's pressure testing which showed a severe drop in natural gas quantities, newspaper articles appearing in the Kansas City Star, which referenced MEC's inability to supply gas to its customers, accusations that MEC had diverted gas held for another business, and Manchester's October 25, 2000 press release which blames MEC for storage problems. Farmland contends that all of these events occurred before Mr. Schuck's review of inventory records.

To fall within the exclusion, the lost natural gas must have been discovered only by audit or upon taking inventory. The undisputed facts demonstrate that the natural gas loss was revealed by a number of facts, some of which certainly occurred before the audit by Farmland.[28] Indeed, Farmland's audit was precipitated by MEC's failure to deliver the gas, which made Farmland believe that the gas was not in the Facility. The purpose of the audit appeared to be to track Farmland's gas to discover how it was lost, not to establish that it had been lost.[29] Construing the exclusionary clause strictly against the Insurers, the Court concludes that the lost natural gas was not revealed only by audit or upon taking inventory.

---

**28.** The Insurers assert that the October 2000 newspaper articles and the October 25, 2000 press release regarding MEC's difficulties "post-date the discovery of the shortage by audit or upon taking inventory." While it is undisputed that on approximately October 11, 2000, Mr. Schuck made copies of Manchester's records, he did not review the records until some time thereafter. The record does not reveal precisely when Mr. Schuck reviewed the storage records, nor when Mr. Schuck reached his conclusions regarding the lost natural gas.

**29.** Mr. Schuck testified that he looked at storage statements between April and October, but he "couldn't really tell exactly what happened" and that from his review of the records, he "could not get a level of detail ... that would allow [him] to specifically track [Farmland's] half of BCF."

## 2. Unexplained or Mysterious Disappearance of Property

 Finally, the Insurers argue that the lost gas is excluded from the Policy as an "unexplained or mysterious disappearance of property." A mysterious disappearance is "any disappearance or loss under unknown, puzzling or baffling circumstances which arouse wonder, curiosity, or speculation, or circumstances which are difficult to understand or explain."[30] The Insurers argue that Farmland "can furnish no explanation whatsoever" for its loss. Farmland, however, has suggested a reason for its loss. Mr. Schuck testified that his record review led him to conclude that Manchester, MEC or Anadarko took Farmland's 500,000 MMBtu of natural gas. Theft is not a mysterious disappearance.[31] Farmland need not prove who is responsible for the theft to overcome the Policy exclusion; it is the Insurer's burden to prove that the Policy exclusion is applicable.[32] Farmland has presented facts to suggest that something other than a mysterious disappearance accounts for its lost natural gas, and summary judgment on this exclusion is therefore inappropriate.[33]

**IT IS THEREFORE ORDERED BY THE COURT** that Farmland's Motion for Summary Judgment (Doc. 29) is DENIED.

**IT IS FURTHER ORDERED BY THE COURT** that the Insurers' Cross-Motion for Summary Judgment (Doc. 33) is DENIED.

IT IS SO ORDERED.

---

30. *Gifford v. M.F.A. Mut. Ins. Co.*, 437 S.W.2d 714, 716 (Mo.Ct.App.1969)

31. *See Van Dutch Prods. Corp v. Zurich Ins. Co.*, 67 A.D.2d 844, 413 N.Y.S.2d 8, 9 (N.Y.App.1979) (a loss is not unexplained or mysterious where there is evidence of theft); *Balogh v. Jewelers Mut. Ins. Co.*, 167 F.Supp. 763, 770 (S.D.Fla.1958) (insurer failed to establish that mysterious disappearance exclusion was met in view of evidence tending to show that the loss was caused by theft); *Stella Jewelry Mfg., Inc. v. Naviga Belgamar Through Penem Int'l Inc.*, 885 F.Supp. 84, 85–86 (S.D.N.Y.1995) (same).

32. *See Betty v. Liverpool & London & Globe Ins. Co.*, 310 F.2d 308, 310–11 (4th Cir.1962) (An all risk policy exclusion for unexplained losses or mysterious disappearances of property did not shift the burden of proving that loss fell within exclusion from the insurer to the insured).

33. *Sphere Drake Ins. PLC v. Trisko*, 24 F.Supp.2d 985, 997 (D.Minn.1998)("[P]laintiffs have offered an explanation, supported by circumstantial evidence from several sources, which if believed by the trier of fact could reasonably support an inference of theft .... Defendant has failed to show that this version of events is so illogical, implausible or speculative as to warrant summary judgment for the insurer .... [W]e conclude that Summary Judgment is not warranted, for either party, on the basis of the "unexplained loss" or "mysterious disappearance" exclusion.").