**MARKEL AMERICAN INS. CO., Plaintiff,**

v.

**PAJAM FISHING CORP., Defendant.**

**Civil Action No. 08–10707–JGD.**

United States District Court, D. Massachusetts.

Jan. 27, 2010.

Steven E. Goldman, Brookline, MA, Brad W. Graham, Craig R. Waksler, McGivney & Kluger, Boston, MA, for Plaintiff.

Kevin J. Kiely, Gloucester, MA, for Defendant.

### MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

The plaintiff, Markel American Insurance Company ("Markel"), provided an "all risk" marine insurance policy to the defendant, Pajam Fishing Corporation ("Pajam"), which insured the fishing vessel "MISS SONYA" for "accidental, direct, physical loss or damages ... from an external cause or from a Latent Defect" in the vessel's hull or machinery. The Miss Sonya sank on March 25, 2008 off the shore of Gloucester, Massachusetts, and cannot be examined. Markel has brought a complaint for declaratory judgment seeking a declaration that it has no obligation for damages sustained as a result of the sinking.

This matter is presently before the court on "Plaintiff's Motion for Summary Judgment" (Docket No. 18), by which Markel contends that it is entitled to judgment as a matter of law because Pajam cannot explain the sinking and, therefore, cannot demonstrate that the sinking of the Miss Sonya was the result of an accident and thereby covered under the policy. As de-

tailed below, this court finds that Pajam has put forth sufficient facts to establish that the sinking was accidental to survive summary judgment. Therefore, the motion for summary judgment is DENIED.

## II. *STATEMENT OF FACTS*[1]

Unless otherwise noted, the facts are undisputed for the purposes of the motion for summary judgment. The record is viewed in the light most favorable to Pajam. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993).

### *The Policy*

Markel is a corporation that writes and issues marine insurance polices on small commercial and private vessels. (PF ¶ 1). Pajam is a corporation, solely owned by Corrado Buccheri ("Buccheri").[2] (*Id.*). Pajam owns the fishing vessel "Miss Sonya," which it purchased in or about March 2006. (*Id.* ¶ 2; *see* Buccheri Dep. at 21–22). On or about December 17, 2007, Markel issued a "Commercial Watercraft

Insurance Policy," affording Hull & Machinery coverage in the amount of $148,000.00 for the Miss Sonya. (*See* Policy Cover at 1; Compl. ¶ 6, Amended Answer ¶ 6). Section III of the Policy, which describes the "Watercraft and Equipment Coverage" provides:

### 1. COVERAGE

If a premium charge is made for Watercraft and Equipment Coverage on the Declarations Page and if not *specifically excluded* under this Policy, We will pay for *accidental, direct, physical loss* or damage to the Insured Watercraft from an external cause or from Latent Defect in the Insured Watercraft's hull or machinery (excluding in all cases the cost of repairing or replacing the defective part) provided such loss or damage did not result from the want of due diligence by You.

(Policy at 6 (emphasis added)). The Policy contains several exclusions, none of which include "unexplained loss." [3] (*See* Policy

1. Unless otherwise indicated, the facts are derived from the following materials: (1) Commercial Watercraft Insurance Policy and cover sheet attached to the Complaint ("Policy") (Docket No. 1); (2) Plaintiff's Statement of Material Facts Not in Dispute ("PF") (Docket No. 18); (3) the deposition transcripts attached to the Plaintiff's Statement of Facts, including the deposition of Corrado Buccheri ("Buccheri Dep."), the deposition of Matteo Ferrera ("Ferrera Dep."), and the deposition of Giuseppe Lucido ("Lucido Dep."); (4) Defendant's Local Rule 56.1 Statement of Facts ("DF") (Docket No. 21) and the attached letter from Markel denying coverage; and (5) the affidavits attached to Defendant's Reply Memorandum (Docket No. 27), including the Affidavit of Corrado Buchierri ("Buchierri Aff.") and the Affidavit of William Brindamour ("Brindamour Aff.").

2. The court notes that Pajam's owner's name is spelled "Buccheri" in his deposition, and "Buchierri" in his affidavit. The court will alter its spelling according to the document being cited.

3. The policy provides that Markel "will not pay for loss, damage, expenses or resulting damages caused:

A. By wear and tear, deterioration, marine life, aquatic mammals, inherent vice, vermin, marring, denting, scratching, chipping, electrolysis, corrosion, rust, dampness of atmosphere, weathering, dry rot, osmosis, unseaworthiness or damage due to strain or high speed;
B. By mechanical breakdown, electrical failure or engine overheating;
C. By theft or the unexplained disappearance of the Insured Watercraft's equipment unless there are visible marks of forcible entry or removal, or the entire Insured Watercraft is stolen;
D. By the wrongful conversion, embezzlement or secretion by a mortgagee, vendee, lessee or other person in lawful possession of the Insured Watercraft under a mortgage, conditional sale, lease or other contract or agreement whether written or verbal;
E.A. By ice and/or freezing;

at 7–8). The Policy also includes a list of definitions in Section I, including, but not limited to, the terms "bodily injury;" "insured person;" "insured watercraft;" and "latent defect." (*Id.* at 2). However, the terms "accidental physical loss" and "accident" are not defined by the Policy.

### Condition of the Miss Sonya and the Incident

Pajam submitted evidence that throughout its ownership of the vessel, Miss Sonya was well-maintained, seaworthy, and had never been involved in an accident or any other incident which would have presaged its sinking. (*See* Buchierri Dep. at 43–45). On March 24, 2008, the skipper, Matteo Ferrara ("Ferrara"), and crew member, Giuseppe Lucido ("Lucido"), departed from Gloucester on the Miss Sonya. (PF ¶¶ 6–7, 10). Ferrara and Lucido had been fishing for approximately 20–24 hours and had gone out to the Middle Bank, approximately ten to twelve miles offshore, before deciding to return between 4:30 and 5:00 a.m. on the morning of March 25, 2008. (*Id.* ¶¶ 10, 12).

Roughly a mile and a half from the Gloucester breakwater, the two men realized that there was a problem. (*Id.* ¶ 12). Several video cameras had been installed in different areas of the Miss Sonya, allowing those areas to be viewed from the vessel's wheelhouse. (*Id.* ¶ 13). One camera was in the lazaret, a compartment located at the stern of the vessel. (*Id.* ¶ 14). Having previously noticed that the stern of the Miss Sonya seemed low, Ferrara and Lucido decided to check the video

monitor of the lazaret, and saw water splashing about in that compartment. (*Id.* ¶¶ 14–15). Neither man attempted to determine where the water was coming from or why water was entering the compartment, but they radioed the Coast Guard. (*Id.* ¶¶ 15, 16). They then followed the Coast Guard's instructions and abandoned the rapidly sinking vessel. (*Id.* ¶ 16). While Markel describes the conditions at that time as "calm seas and fair weather" (PF ¶ 4), this is disputed by Pajam. (DF ¶ 4). Rather, Pajam contends that the wind was 20–30 knots, with 3 to 5 feet high swells. (*See* Buchierri Aff. at ¶ 11).

Both Ferrara and Lucido have no idea what caused the Miss Sonya to sink. (*See* PF ¶¶ 16(2)–19). The two men did not feel or perceive any impact while they were at sea. (*Id.* ¶ 16). However, Pajam has submitted evidence that the weather conditions would have greatly reduced the crew's ability to notice any impact with any object, since "[o]ne's ability to feel a collision in calm conditions is dramatically different than when the boat is pitching and rolling in rough seas." (Buchierri Aff. at ¶ 11). In addition, Pajam has submitted an affidavit from its expert opining that the weather may have caused the rudder to "wrack" from side to side and, given the rudder's design, that may have created "sufficient torque to create a crack in the rudder stock tube, below the waterline causing the lazarette to fill with water." (Brindamour Aff. ¶¶ 4–6).

On April 22, 2008, Markel sent Pajam a letter stating that, following an investiga-

---

F. By any accident occurring while the Insured Watercraft is being operated in, or in preparation for any race, speed or stunting contest. This does not apply to sailboats or predicted log events;
G. By any accident to any spinnaker while racing;
H. By electricity or electrical apparatus other than lightning, unless fire results and

then only for the damage caused by the ensuing fire;
I. By loss overboard of outboard motors or equipment; or
J. By any accident involving an operator of the Insured Watercraft with a blood alcohol concentration in excess of the applicable legal limit.
(Policy at 7–8).

tion, it had determined that the unexplained sinking of the Sonya was not covered under the Policy. (*See* Markel Letter 1–2). Pajam denies that a complete investigation was done by Markel. (*See* DF at Part II, ¶ 1). Markel commenced this declaratory judgment action against Pajam on April 28, 2008, asserting that Pajam cannot meet its burden of establishing that there is coverage under the Policy. There is no contention that Pajam intentionally sank the ship, or otherwise engaged in intentional conduct that caused the Miss Sonya to sink.

## III. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (internal quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." *Id.* (internal quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S.Ct. at 2553. The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in

that party's favor. *See O'Connor*, 994 F.2d at 907. "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." *Walsh v. Town of Lakeville*, 431 F.Supp.2d 134, 143 (D.Mass.2006).

Applying this standard compels the conclusion that the motion for summary judgment be denied.

### B. *Insurance Contract Interpretation*

 "An insured generally bears the burden of proving that a particular claim falls within a policy's coverage, while an insurer has the burden of proving the applicability of a particular exclusion." *Allmerica Fin. Corp. v. Certain Underwriters at Lloyds', London*, 449 Mass. 621, 628, 871 N.E.2d 418, 425 (2007) (internal citation omitted). "An insurance contract is to be interpreted according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed." *Id.* (internal quotation omitted). The court "must construe the words of the policy in their usual and ordinary sense." *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 355, 910 N.E.2d 290, 304 (2009) (internal quotation omitted). When construing an insurance policy, it is appropriate for courts "to consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 407 Mass. 689, 700, 555 N.E.2d 576, 583 (1990). Moreover, "[a]ny ambiguities in the language of an insurance contract are interpreted against the insurer who used them and in favor of the insured." *Allmerica Fin. Corp.*, 449 Mass. at 628, 871 N.E.2d at 425.

■ In the instant case, the policy does not contain any definition of "accidental physical loss." "The term 'accident' is to be broadly construed in a policy insuring against damage by accident. In its common signification the word means an unexpected happening without intention or design." *Beacon Textiles Corp. v. Employers Mut. Liab. Ins.*, 355 Mass. 643, 645–46, 246 N.E.2d 671, 673 (1969) (internal citation omitted), quoted in *Quincy Mut. Fire Ins. Co. v. Abernathy*, 393 Mass. 81, 83, 469 N.E.2d 797, 799 (1984). "Accidental" is synonymous with "fortuitous." *See St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1202 (1st Cir.1994) ("The courts are practically agreed that the words 'accident' and 'accidental' mean that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual, and unforeseen.") (internal quotations and citations omitted). "A loss is fortuitous unless it results from an inherent defect, ordinary wear and tear, or intentional misconduct of the insured." *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 307 (2d. Cir.1987) (internal citations and quotations omitted).

As Markel recognizes, its Policy "is what is commonly termed an 'all risk' policy" that "also includes and is therefore subject to a specific and express limitation which states that the policy affords coverage only for 'accidental physical loss or damage ... from an external cause or from a Latent Defect....'" (Pl. Reply Mem. (Docket No.

24) at 1–2). "An all-risk insurance policy creates a special type of insurance extending to risks not usually contemplated." *Farmland Indus., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 333 F.Supp.2d 1133, 1138 (D.Kan. 2004) (internal quotation omitted). While these are not "all loss" policies and contain express and implied exclusions, "recovery under an all-risk policy will generally be allowed, at least for all losses of a fortuitous nature, in the absence of fraud, or other intentional misconduct of the insured, unless the policy contains a specific provision expressly excluding the loss from coverage." *Id.* (internal quotation omitted).[4]

As detailed below, Pajam has put forth sufficient facts to establish that the sinking was the result of a fortuitous, accidental event. Therefore, Markel's motion for summary judgment must be denied.

### C. Whether the Miss Sonya's Sinking was an Accident

■ Markel contends that Pajam must be able to prove the cause of the sinking in order to meet its burden of proving that there is coverage. This argument is not persuasive. To establish a fortuitous loss it is generally sufficient for the insured to show only that the loss occurred. *See Atl. Lines Ltd. v. Am. Motorists Ins. Co.*, 547 F.2d 11, 12–13 (2d Cir.1976) (in all risk policy, insured does not need to prove cause of loss to establish that a loss was fortuitous). In the instant case, through the testimony of the vessel's

---

4. These state-law based principles are consistent with the "fortuity rule" applied by federal courts in marine insurance cases, which rule provides that "all-risk policies in marine insurance contracts only cover losses caused by fortuitous events[.]" *Youell v. Exxon Corp.*, 48 F.3d 105, 110 (2d Cir.1995), *vacated on other grounds, Exxon Corp. v. Youell*, 516 U.S. 801, 116 S.Ct. 43, 133 L.Ed.2d 9 (1995). "The fortuity rule excludes from coverage losses that arise from inherent defects, wear and tear, or from the insured's wilful misconduct; losses that arise from acts of nature, or the insured's negligence, are covered." *Youell*, 48 F.3d at 110. *Accord Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 307 (2d. Cir.1987). Markel references the federal rule but does not contend that it requires any different analysis than state law cases interpreting insurance policies covering "accidental" losses. *See* Pl. Mem. (Docket No. 19) at 6–7.

owner and crew, Pajam has established that the vessel was well maintained, and that there was no intentional misconduct which caused the vessel to sink. This is sufficient "to prove a fortuitous loss of the covered property" and the insured "need not prove the cause of the loss." *In re Balfour MacLaine Intern. Ltd.*, 85 F.3d 68, 77 (2d Cir.1996). *See also Schiappa v. Natl. Marine Underwriters, Inc.*, 56 Mass. App.Ct. 161, 165, 775 N.E.2d 791, 794 (Mass.App.Ct.2002) (To "show that a fortuitous loss has occurred, in the case of a mysterious disappearance, a showing that loss has occurred is generally sufficient, although the insured may also be required to furnish a good faith explanation.' ") (quoting 10 Couch, Insurance § 151:36 (3d. ed. 1998)).[5] Moreover, if insurers intend to exclude "unexplained losses" from coverage, they customarily include such an exclusion in the policy. *Atlantic Lines Ltd.*, 547 F.2d at 13. No such exclusion is contained in the Policy at issue in this case.

 "All risk" policies such as the one issued by Markel cover the "fortuitous loss" of the goods insured, unless such a loss is expressly excluded. *In re Balfour MacLaine Intern. Ltd.*, 85 F.3d at 77. Here, Pajam has put forth sufficient evidence to establish that the loss was accidental as it was not the result of intentional misconduct of the insured. *Id.*; *Ingersoll Milling Mach. Co.*, 829 F.2d at 307. This is sufficient to survive Markel's motion for summary judgment.

Finally, *Great Lakes Reinsurance (U.K.) PLC v. Soveral* ("*Great Lakes*"), No. 05–80923, 2007 WL 646981, at *3 (S.D.Fla. Feb. 27, 2007), relied on by Markel, does not compel a different result. There, like here, the issue was whether the

sinking of a vessel was covered by an all risk marine policy that covered all accidental losses. *Id.* at *2. There, like here, the policy did not define the term "accident," but the court found "that accident is synonymous with fortuitous." *Id.* at *3. There, unlike here, however, the cause of the ship sinking was known—the boat was left completely uncovered in the Bahamas during the rainy season, water entered the boat, the bilge pumps eventually drained the battery and the battery died, silencing the bilge pumps and leaving the boat to fill with water and sink. *Id.* The court found that the "deterioration of a battery constitutes normal wear and tear and is not fortuitous" and that water entering an uncovered vessel during rainy season in the Bahamas also was not fortuitous. *Id.* at *3–4. As a result, in *Great Lakes*, the insured did not meet its burden of proving that the sinking was accidental. *Id.* at *4. However, there is nothing in *Great Lakes* which requires an insured to prove the cause of a fortuitous event in order to satisfy its burden of proving that the loss is covered. Therefore, nothing in that case undermines this Court's conclusion that summary judgment must be denied.

## IV. CONCLUSION

For all the reasons detailed herein, this Court finds that Pajam has put forth sufficient facts to meet its burden of proving that the sinking of the Miss Sonya was accidental and covered under the applicable insurance Policy. Accordingly, "Plaintiff's Motion for Summary Judgment" (Docket No. 18) is DENIED.

---

5. To the extent it was required to do so, Pajam has proffered a viable explanation for why the ship sank based on available facts. Most persuasive, however, is the fact that it has put forth evidence which, if believed, establishes that the loss was the result of an accident, *i.e.*, was not due to intentional wrongdoing.