NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

15-P-1554                                        Appeals Court

THE HANOVER INSURANCE GROUP, INC. vs. RAW SEAFOODS, INC.

No. 15-P-1554.

Suffolk.     September 16, 2016. - April 26, 2017.

Present:  Agnes, Neyman, & Henry, JJ.

Insurance, General liability insurance, Coverage.  Words,
     "Occurrence."

Civil action commenced in the Superior Court Department on
September 21, 2012.

The case was heard by Christine M. Roach, J., on motions
for summary judgment.

Michael J. Daly (Samuel P. Blatchley also present) for the
defendant.
Jeffrey E. Dolan (Anthony M. Campo also present) for the
plaintiff.

NEYMAN, J.  In this case we analyze whether damage to

scallops at a seafood processing facility, where the precise

cause of damage is unknown, constituted an "occurrence" within

the meaning of a commercial general liability (CGL) policy.  A

Superior Court judge concluded that the defendant-insured, Raw

Seafoods, Inc. (RSI), has no reasonable expectation of proving that its claimed loss was caused by an occurrence, and granted summary judgment in favor of the plaintiff-insurer, Hanover Insurance Group, Inc. RSI appeals therefrom. We reverse.

Background. 1. RSI and the damaged scallops. RSI is a seafood processing facility in Fall River. One of RSI's customers, Atlantic Capes Fisheries, Inc. (Atlantic), sells scallops and other types of seafood around the world. Atlantic purchases fresh scallops from fishing vessels, then transports the scallops to RSI for processing, portioning, packaging, and freezing. RSI's staff inspects the scallops for quality upon arrival, reports the results to Atlantic, and receives processing instructions from Atlantic. After processing, the scallops are transported to Arctic Cold Storage (Arctic), a third-party cold storage facility. Atlantic then ships its customers' orders directly from Arctic's facility. RSI handles approximately 4 million to 6 million pounds of scallops for Atlantic per year.

In July, 2011, RSI-processed scallops were making their way through customs in Denmark, heading to an Atlantic customer. Upon inspection, the 37,102 pounds of scallops were found to be decomposed, exhibited a strong ammonia smell, and were deemed unacceptable for human consumption. By all accounts, something

was rotten in the state of Denmark.[1]  The United States Food and Drug Administration tested the scallops and confirmed that they were spoiled.  The scallops were then returned to Arctic's facility, where representatives from Atlantic and RSI jointly inspected the shipment and confirmed the damage.  They also inspected another batch of scallops, processed by RSI for Atlantic around the same time as the rejected batch, and discovered approximately 20,000 additional pounds of damaged product.

2.  <u>The underlying litigation</u>.  In 2012, Atlantic brought an action against RSI in the United States District Court for the District of Massachusetts (the "underlying litigation"), which included a count for negligence for the damage to the scallops.  At that time, Hanover insured RSI pursuant to a CGL policy (policy), and agreed to defend RSI in the underlying litigation (with counsel selected by RSI), while reserving its right to deny coverage under the policy.

During discovery in the underlying litigation, RSI's president, Jason Hutchens, acknowledged that the scallops were delivered to RSI in good condition, but that "somewhere in [RSI's] system, the product got messed up."  It is undisputed that the damage occurred while the scallops were in RSI's possession, but the precise cause of the damage at RSI's

---

[1] William Shakespeare, Hamlet, act I, scene 4.

facility remains unknown.  Hutchens stated that "we've never seen anything like this before . . . we beat our heads against the wall for, it seemed like months, trying to figure this out. We've never seen anything like it and haven't seen anything after this problem.  But we can't put our hands around it, how it happened and why it happened -- we don't know."  Nonetheless, he agreed that, to his understanding, "[t]he damage occurred in [RSI's] custody" and "was the result of some, as yet, unknown failure on the part of [RSI's] processing people or handling people within [RSI's] plant."  He further agreed that the damage to the scallops could have occurred because someone failed to "maintain temperatures carefully enough."  Atlantic's chief operating officer, Jeffrey Bolton, agreed with Hutchens's statements and added that his "assumption is that somewhere along the line during the process of the scallops that [Atlantic] shipped to [RSI], there was temperature abuse, and that's why they were deemed decomposed."

Atlantic moved for summary judgment in the underlying litigation under the doctrine of res ipsa loquitur, arguing that it was undisputed that Atlantic had delivered the scallops to RSI in good condition; RSI had exclusive control over the scallops until they were delivered to Arctic in a frozen state; the scallops were not damaged after they were delivered to Arctic; although the precise cause of the damage was unknown,

RSI accepted responsibility for damaging the scallops; and the damage could only have been caused by RSI's negligent handling of the product. Atlantic further contended that while it could not conclusively establish precisely where in RSI's handling the scallops were damaged, the most likely cause was "temperature abuse" caused by "RSI's personnel's failure to monitor the temperature in some vats of scallops." A Federal District Court judge granted Atlantic's motion for summary judgment "for the reasons stated therein," and issued a judgment against RSI and in favor of Atlantic in the amount of $599,790.08 with postjudgment interest.

3. The policy. At all relevant times Hanover insured RSI. RSI's policy with Hanover provides in relevant part that Hanover "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." By its terms, the policy applies to "property damage" that is caused by an "occurrence." The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy also contains several exclusions limiting the application of the policy, as well as a "special broadening endorsement."[2] However, where the

---

[2] The special broadening endorsement modifies insurance coverage and the scope of certain exclusions in the policy.

judge decided the motion for summary judgment solely on her determination that RSI could not show that there was an occurrence within the meaning of the policy, we need not delve into these additional provisions here.

4. The present action. During the pendency of the underlying litigation, Hanover filed the present action in the Superior Court. Hanover sought a declaratory judgment that either the damage to the scallops was not caused by an "occurrence" within the meaning of the policy, or the damage to the scallops fell under one or more exclusions to the policy, such that Hanover had no duty to indemnify RSI for any judgment in the underlying litigation. RSI filed an answer and asserted counterclaims for breach of contract and violations of G. L. cc. 93A and 176D. The Superior Court allowed RSI's motion to stay discovery in the present action, which Hanover opposed, pending resolution of the underlying litigation. After judgment entered against RSI in the underlying litigation, a Superior Court judge further stayed discovery and the parties filed cross motions for partial summary judgment on the issue of coverage. A different Superior Court judge held a hearing on the cross motions and granted summary judgment in favor of Hanover. In a comprehensive decision, the judge concluded that "because there was no demonstrated accident distinct from [RSI's] performance of its work," RSI could not meet its burden of proving that its

claimed loss was caused by an "occurrence," as a matter of law. The judge also dismissed RSI's counterclaims as moot. RSI timely appealed.

Discussion. 1. Legal standards. a. Summary judgment. Summary judgment is appropriate where there are no issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). We review a decision to grant summary judgment de novo. See Boazova v. Safety Ins. Co., 462 Mass. 346, 350 (2012). "[W]here both parties have moved for summary judgment, the evidence is viewed in the light most favorable to the party against whom judgment has entered." Ibid. (citations and quotations omitted). "A party seeking summary judgment may satisfy its burden of demonstrating the absence of triable issues by showing that the party opposing the motion has no reasonable expectation of proving an essential element of its case." Ibid. (citations omitted).

b. Insurance contract interpretation. Questions concerning the interpretation of an insurance contract are questions of law. Fuller v. First Fin. Ins. Co., 448 Mass. 1, 5 (2006). Pacific Indem. Co. v. Lampro, 86 Mass. App. Ct. 60, 65 (2014). RSI, as the insured, bears the burden of proving its claim falls within the scope of coverage provided by the policy. Boazova, supra at 351. Thus, to survive summary judgment, RSI

must demonstrate that it has a reasonable expectation of proving that the claimed loss was caused by an "occurrence," which, as discussed above, is defined in the policy as an "accident."

Under Massachusetts law, an "accident" is commonly defined as "an unexpected happening without intention or design." Liberty Mut. Ins. Co. v. Tabor, 407 Mass. 354, 358 (1990), quoting from Beacon Textiles Corp. v. Employers Mut. Liab. Ins. Co., 355 Mass. 643, 646 (1969). See also Pacific Indem. Co., supra (accident implies fortuitous or unexpected event). Massachusetts courts broadly construe the term "accident" in an insurance policy. Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 83 (1984). See also Vappi & Co. v. Aetna Cas. & Sur. Co., 348 Mass. 427, 432-433 (1965) ("The breadth of interpretation given to the term 'accident' by Massachusetts cases makes it unnecessary to deal with Federal cases and cases from other jurisdictions cited by [the insurer]").

2. Analysis. a. Occurrence. With these guiding principles in mind, we turn to the question whether the damage to the scallops was caused by an "occurrence" under the policy. The parties agree that the cause of the damage "was the result of some, as yet, unknown failure on the part of [RSI's] processing people or handling people within [RSI's] plant." The consensus ends there.

RSI contends that the record demonstrates that it has a reasonable expectation of proving an occurrence; i.e., that RSI did not specifically intend to destroy the scallops and that it was an accident rather than an anticipated event. As noted above, such an event had never occurred before and has not occurred since. RSI grounds its argument on (1) the finding of negligence in the underlying litigation, and (2) the decision in the Beacon Textiles case, in which damage to a product caused by an unexplained defect was held to constitute an accident.

Hanover counters that RSI has produced no evidence as to precisely how the scallops were damaged, leaving the actual cause of the damage to speculation and conjecture. Therefore, RSI has no reasonable expectation of proving that the damage was caused by an occurrence and cannot survive a motion for summary judgment. See, e.g., Brooks v. Peabody & Arnold, LLP, 71 Mass. App. Ct. 46, 56 (2008). Hanover further argues that even assuming RSI could prove that the damage was caused by some mishandling of the scallops on RSI's part, RSI has no reasonable expectation of proving that the scallops were damaged by a fortuitous event, and not by a "normal, foreseeable, and expected incident of doing business." Pacific Indem. Co., 86 Mass. App. Ct. at 65.

We conclude that Massachusetts law favors RSI's position. While the precise cause or mechanics of the damage to the

scallops is unknown, the summary judgment record supports the conclusion that the damage resulted from an unanticipated mishap during RSI's processing operation. Atlantic is a consistent RSI customer for whom RSI handles approximately 4 million to 6 million pounds of scallops for Atlantic per year. In the nearly seventeen years RSI had been in business, it has "never seen anything like this before . . . and [had not] seen anything after this problem." In other words, viewed in the light most favorable to RSI, the damage resulted from an accident, and not from a routine consequence of RSI's work.

Hanover maintains that even assuming that the damage resulting from RSI's mishandling of the scallops was atypical or even anomalous, absent evidence to the contrary RSI can only speculate that the damage stemmed from unintended conduct. Therefore, Hanover posits, RSI still cannot sustain its burden of proving that the scallops were damaged by an accident, rather than by intentional conduct or a "normal, foreseeable, and expected incident of doing business." Pacific Indem. Co., supra.[3] Hanover's argument ignores that the underlying

---

[3] The summary judgment record is devoid of any evidence or claim that fraud, collusion, or subterfuge played any role in causing the damage. Hanover does not argue to the contrary. Compare Vappi & Co., 348 Mass. at 432 ("Unintended or unforeseen circumstances of reckless or negligent acts, and even of intentional acts, at least if not undertaken 'with malice or intent to injure' the person or property hurt . . . may be within the definition of 'accident'").

litigation by Atlantic against RSI went to judgment on a claim of negligence.  Although the precise cause and mechanism of damage was not established, Atlantic prevailed in the underlying litigation on a theory of res ipsa loquitur.  Cases on res ipsa loquitur are clear that the doctrine is simply a way of establishing negligence.  See Edwards v. Boland, 41 Mass. App. Ct. 375, 377-378 (1996); Restatement (Second) of Torts § 328D(1)(a) (1965).  We have found no Massachusetts precedent for the proposition that a determination of negligence through the application of res ipsa loquitur is treated any differently from any other determination of negligence.

Hanover responds that the judgment in the underlying litigation contains no findings delineating how the scallops were specifically damaged, and thus negligence and fortuity were not demonstrated.  Contrary to Hanover's claim, the court in the underlying litigation granted Atlantic's motion for summary judgment "for the reasons stated therein" and in doing so, necessarily held, on the undisputed facts, that the only explanation for the damage to the scallops was RSI's negligent handling of the product.[4]  Because the basis for RSI's liability

---

[4] Atlantic and RSI were in agreement as to the facts in the underlying litigation and the conclusion that the damage was consistent with mishandling of scallops.  Although the parties could not conclusively establish precisely where in RSI's handling the scallops were damaged, Atlantic's chief operating officer testified that the most likely cause was "temperature

-- negligence under a res ipsa loquitur theory -- was

established in an underlying case that went to judgment, the

insurer, Hanover, is bound by that ground.[5]  The insurer cannot

relitigate factual issues decided in the underlying case.  This

has long been the rule in Massachusetts.[6]  We further note that

there is no indication in the record that Hanover sought to

---

abuse caused by RSI's personnel's failure to monitor the
temperature in some vats of scallops, resulting in spoilage that
went undetected prior to the product being frozen.  Failure to
manually ice the vats is likely the precise cause of the
damage."

[5] Hanover's claim that all other causes of damage were not
explicitly ruled out also misses the mark.  See Restatement
(Second) of Torts § 328D (1965) comment f ("plaintiff is not
required to exclude all other possible conclusions beyond a
reasonable doubt, and it is enough that he makes out a case from
which the jury may reasonably conclude that the negligence was,
more probably than not, that of the defendant").

[6] In Miller v. United States Fid. & Guar. Co., 291 Mass.
445, 448-449 (1935), the Supreme Judicial Court held that
"[w]here an action against the insured is ostensibly within the
terms of the policy, the insurer, whether it assumes the defence
or refuses to assume it, is bound by the result of that action
as to all matters therein decided which are material to recovery
by the insured in an action on the policy. . . . This case is
but one instance under a rule of broad application that an
indemnitor, after notice and an opportunity to defend, is bound
by material facts established in an action against the
indemnitee."  See also Jertson v. Hartley, 342 Mass. 597, 602-
603 (1961) (following rule in Miller); Blais v. Quincy Mut. Fire
Ins. Co., 361 Mass. 68, 70-71 (1972) ("In the absence of fraud
or collusion the insurer would be bound by a judgment entered by
default.  A judgment by consent stands no worse"); Polaroid
Corp. v. Travelers Indem. Co., 414 Mass. 747, 763 n.20 (1993),
citing Miller, supra at 448-449 ("If an underlying case went to
judgment, the insurer would be bound by the result of the trial,
as to all material matters decided in that action that bear on
the coverage issue").

intervene in the underlying litigation. See, e.g., Newton v. Krasnigor, 404 Mass. 682, 683 (1989); Liquor Liability Joint Underwriting Assn. v. Hermitage Ins. Co., 419 Mass. 316, 323-324 (1995).

Additionally, the judgment on Atlantic's negligence claims in the underlying litigation precludes a subsequent determination of intentional conduct by RSI in the present case. Intentional and negligent conduct are mutually exclusive. Miller v. United States Fid. & Guar. Co., 291 Mass. 445, 447 (1935) ("[N]egligence and wilful and wanton conduct are so different in kind that words properly descriptive of the one commonly exclude the other"); Sabatinelli v. Butler, 363 Mass. 565, 567 (1973) ("Under the law of the Commonwealth, the difference between intentional and negligent conduct is a difference in kind and not in degree. If conduct is negligent it cannot also be intentional"); Waters v. Blackshear, 412 Mass. 589, 590 (1992) ("intentional conduct cannot be negligent conduct and . . . negligent conduct cannot be intentional conduct"); Metropolitan Property & Cas. Ins. Co. v. Morrison, 460 Mass. 352, 361 (2011) (finding of negligence is inconsistent with finding of intentional and criminal act).

The Beacon Textiles decision further bolsters RSI's position. There, an insured sustained loss caused by yarn which changed color after the yarn was used in a customer's sweaters.

The evidence showed that the yarn was defective in the insured's possession before it was delivered to the customer. Beacon Textiles Corp., 355 Mass. at 645. The insured had been in business as a seller of yarn for over thirty years and discoloring of its yarn had never before occurred. Ibid. The cause of the defect remained unknown. The Supreme Judicial Court concluded that "[s]ome ingredient or ingredients of the dyed yarn acted or failed to act at some point in time contrary to the intention and expectation of the person who put them together," and held that "a change of color in yarn due to a latent unexplained defect is an accident." Ibid. In making this determination, the court relied on the rule that "[t]he term 'accident' is to be broadly construed in a policy insuring against damage by accident." Ibid.

Hanover attempts to distinguish the Beacon Textiles decision on several grounds. First, Hanover claims that the term "occurrence" does not appear in that case and the court was interpreting a different policy provision prior to decades of jurisprudence interpreting the meaning of "occurrence." We disagree. The court in the Beacon Textiles case interpreted the meaning of the term "accident" in an insurance policy which obligated the insurer "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property,

including the loss of use thereof, caused by accident."  Ibid.
In the present case, "occurrence" is defined by Hanover as an
"accident."  The alleged distinction is unpersuasive.
Furthermore, the Supreme Judicial Court has never overruled or
limited the application of the Beacon Textiles decision.  To the
contrary, the case has been cited approvingly by Massachusetts
courts.  See, e.g., Quincy Mutual Fire Ins. Co., 393 Mass. at
83; Liberty Mut. Ins. Co., 407 Mass. at 358; Powell v. Fireman's
Fund Ins. Cos., 26 Mass. App. Ct. 508, 515 (1988); Preferred
Mut. Ins. Co. v. Gamache, 42 Mass. App. Ct. 194, 197 (1997).
See also Markel Am. Ins. Co. v. Pajam Fishing Corp., 691 F.
Supp. 2d 260, 265 (D. Mass. 2010).

Next, Hanover alleges that in the Beacon Textiles case, the
defendant insurer identified an expert who was able to attribute
damage to a defect that preexisted the transmission of the yarn
to the end user.  Thus, the damage in that case was not
completely unexplained.  Contrary to this interpretation, the
court in the Beacon Textiles decision merely states that an
expert concluded that the yarn was defective in the insured's
hands before it was delivered to the customer.  Beacon Textiles
Corp., 355 Mass. at 645.  There was no indication that the
expert narrowed or defined any specific cause of the damage to
the yarn.  Likewise, in the present case, all parties agreed
that the scallops were damaged in the insured's hands before

they were delivered to the customer.  The claimed distinction raised by Hanover is inapposite.

Hanover also argues that the Beacon Textiles case involved an insured that was accused only of selling defective yarn, and did not involve a claim where a product was allegedly damaged during the performance of the insured's work.  The purported distinction misses the key point that, in both instances, the damage or defect stemmed from an unknown cause and occurred while the insured was in control of the product (i.e., the yarn and the scallops).  In neither case could the parties determine with certainty the specific cause of the damage.

Finally, Hanover contends that the present case is controlled by Pacific Indem. Co., 86 Mass. App. Ct. at 66, and that a finding that the damage to the scallops was caused by an occurrence is foreclosed under this precedent.  This argument is also unpersuasive.  In that case, the insured was hired to cut down trees.  Indeed, it cut down more trees than directed, failed to follow restrictions in cutting brush and trees, and "exceeded the scope of the [relevant] permits."  Ibid.  Cutting down trees was part and parcel of the insured's ordinary work process.  Furthermore, the insured intended to engage in the "clear-cutting" at issue.

In the present case, by contrast, damaging scallops was not part of the ordinary work process, and, as evidenced by the

finding of negligence in the underlying litigation, RSI did not intend to cause the resulting harm.[7] Moreover, the evidence in the summary judgment record in the underlying litigation supports the conclusion that the destruction of the scallops was the result of an accident. RSI has been processing scallops using the same method for the greater part of seventeen years. Whatever caused the harm to the scallops had never occurred before and has not occurred since. Furthermore, Atlantic did

---

[7] Hanover also argues that RSI's argument is contrary to Friel Luxury Home Constr., Inc. vs. ProBuilders Specialty Ins. Co. RRG, No. 09-CV-11036-DPW (D. Mass. 2009). That case, which is not binding on this court, is readily distinguishable. There, the insured-builder was sued (via counterclaim) in the underlying case for the cost of repairing numerous deficiencies in a home it had negligently constructed. The defects were characterized as being the result of the builder's "faulty workmanship." Id. at 3. The counterclaim alleged that the builder had "failed to perform work consistent with even minimum industry standards and also materially misrepresented aspects of the nature and the cost of the work." Id. at 1. For example, the plumbing was incorrectly installed, the roofing work was "shoddy," the ceilings were not level, certain walls were bulging, and the stairs were not adequately supported in accordance with the building code. Ibid. The builder argued that the defects "must" have been accidental because it did not specifically intend to cause the homeowner's harm, nor was it substantially certain that such harm would occur. Id. at 5. The court rejected this argument and noted that under Massachusetts law, faulty workmanship generally fails to constitute an accidental occurrence in a commercial liability policy because "a failure of workmanship does not involve the fortuity required to constitute an accident." Ibid. The court opined that in these circumstances, none of the numerous alleged defects in the builder's work were "reasonably susceptible" of an interpretation that they were accidental, and concluded that there was no "occurrence" resulting in property damage within the meaning of the policy. Ibid. Thus, the insurer had no duty to defend the builder in the underlying case.

not sue RSI to have the defective processing redone, but rather for the value of the damaged property.  Contrast Friel Luxury Home Constr., Inc. vs. ProBuilders Specialty Ins. Co. RRG, No. 09-CV-11036-DPW (D. Mass. 2009) (homeowners sued builder for cost of hiring someone else to redo builder's defective work). This case is about protecting RSI from liability for the damage it negligently caused to the property of a third party, Atlantic.  It is not about reimbursing RSI for the cost to reprocess the scallops or, in essence, redoing its own defective work.  See Oxford Aviation, Inc. v. Global Aerospace, Inc., 680 F.3d 85, 88-89 (1st Cir. 2012).

In short, the present case is controlled by the reasoning in the Beacon Textiles decision, and Hanover's efforts to distinguish that case are unconvincing.[8]  This precedent, combined with the finding of negligence in the underlying litigation and the broad construction of the term "occurrence" in a CGL policy, compels us to conclude that RSI has a reasonable expectation of proving that the unexplained damage was caused by an occurrence.  See Vappi & Co., 348 Mass. at 432 ("This court will be slow to adopt any narrow construction of

---

[8] Were we to accept Hanover's argument, an insured would never have a reasonable expectation of proving that damage was caused by an occurrence if it could not specify the precise cause of such damage.  We think that such a blanket rule would undermine the broad construction of CGL policies required by our precedent, and unfairly limit coverage.  See Quincy Mutual Fire Ins. Co., 393 Mass. at 83.

the term 'accident' which will limit or defeat any coverage fairly intended to be given by a policy described by the insurer in such broad terms . . . ").  Thus, the judge erred in allowing Hanover's motion for summary judgment.

b.  Exclusions.  Because the judge concluded that RSI did not meet its initial burden of proving that its claimed loss was caused by an occurrence, she did not analyze the applicability of any exclusions or the special broadening endorsement.  RSI contends that we need not remand the matter for determination as to the applicability of the exclusions.  Although the determination thereof is a question of law, we conclude that a remand is appropriate in this case.  See, e.g., Middleborough v. Middleborough Gas & Elec. Dept., 422 Mass. 583, 588 (1996); Szymanski v. Boston Mut. Life Ins. Co., 56 Mass. App. Ct. 367, 382 (2002).  Hanover did not argue the applicability of the exclusions in its opposition and cross motion for summary judgment or in its appellate brief.  Nonetheless, we disagree with RSI's assertion that Hanover waived its arguments regarding the exclusions.[9]

c.  Duty to defend and RSI's counterclaims.  The judge granted summary judgment in Hanover's favor, and further ordered

_____

[9] The record reflects some confusion between the parties and the judge as to what specific issues were to be briefed in the partial motions for summary judgment.  The record supports Hanover's position that it did not waive the right to address the applicability of the relevant exclusions.

that "the remaining claims and counterclaims of the parties are DISMISSED with prejudice, as moot."  Where we hold that summary judgment should not have entered for Hanover, we vacate the judgment entered by the Superior Court, and remand for further proceedings consistent with this opinion regarding (1) the applicability of the exclusions, (2) Hanover's duty to defend,[10] and (3) RSI's counterclaims for breach of contract and violations of G. L. cc. 93A and 176D.[11]

So ordered.

---

[10] Hanover defended RSI in the underlying litigation pursuant to a reservation of rights with counsel selected by RSI.  However, RSI contends that Hanover did not pay all of the legal bills and expenses incurred therein.

[11] Hanover explicitly sought to conduct discovery in the Superior Court prior to the filing of the cross motions for summary judgment.  A Superior Court judge rejected Hanover's request and stayed all discovery pending the motions for partial summary judgment on the question of coverage.  Hanover continues to seek discovery regarding the applicability of the exclusions. Whether and to what extent discovery will be allowed as to all issues in the case going forward, including the timing and scope thereof, is left to the discretion of the judge of the Superior Court.